IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JANINE L. FIELDHOUSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 C 6358 |
| v. | ) | |
| | ) | Magistrate Judge |
| MICHAEL J. ASTRUE, | ) | Maria Valdez |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Janine Lee Fieldhouse's claim for Disability Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Fieldhouse's motion for summary judgment [Doc. No. 23] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner of Social Security for further proceedings.

# BACKGROUND

## I.    PROCEDURAL HISTORY

Plaintiff Janine Lee Fieldhouse ("Plaintiff," "Claimant," or "Fieldhouse") originally filed an application for a period of disability and disability insurance benefits on November 7, 2005, alleging disability beginning June 17, 2005. (R. 54.) Plaintiff's claim was denied initially on March 30, 2006, and upon reconsideration on May 24, 2006. (*Id.*) Plaintiff timely filed a written request for a hearing by an Administrative Law Judge ("ALJ") on July 25, 2006. (*Id.*) On October 24, 2008, Plaintiff personally appeared and testified at the hearing and was represented by counsel. (*Id.*) An impartial vocational expert ("VE"), Dennis W. Gustafson, also appeared at the hearing. (*Id.*)

On November 12, 2008, the ALJ denied Plaintiff's claim and found her "not disabled" under the Social Security Act. (*Id.* at 62.) On January 16, 2009, Plaintiff requested review of the ALJ's decision. (*Id.* at 45.) In addition to the Request for Review of Hearing Decision / Order form, Plaintiff sent two Magnetic Resonance Imaging ("MRI") exam reports dated November 28, 2008 to the Social Security Administration Appeals Council ("Appeals Council") for consideration. (*Id.* at 44-50.)[1] The Appeals Council notified Plaintiff that it had granted the request for

---

[1] Plaintiff sent a letter from Dr. Elizabeth Ritz to the Appeals Council on February 9, 2009. (R. 24.)

review on March 24, 2009.[2] (*Id.* at 21.) On June 2, 2009, the Appeals Council issued a decision, adopting the ALJ's findings or conclusions regarding whether Plaintiff was disabled. (*Id.*) The Appeals Council did not agree with the ALJ's finding that Plaintiff's date last insured for disability benefits was June 30, 2008; instead, the Appeals Council determined that the Plaintiff's date last insured was September 30, 2008. (*Id.* at 21-22.) In its decision, the Appeals Council noted that "[n]o comments or additional evidence have been received." (*Id.* at 21.) On June 16, 2009, Plaintiff requested that the matter be reopened due to the Appeals Council's failure to consider Plaintiff's new evidence. On August 28, 2009, the Appeals Council denied Plaintiff's request to reopen and change its June 2, 2009 decision. (*Id.* at 7.) The Appeals Council's June 2, 2009 decision is the final decision of the Commissioner of Social Security ("Commissioner"), and is reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Plaintiff filed the instant motion on June 9, 2010.

## II.    FACTUAL BACKGROUND

### A.    <u>Fieldhouse's History</u>

Fieldhouse was born on July 2, 1960, and was forty-four years old on June 17, 2005, the date on which she claims her disability period began. (R. 125.) Though not characterized as such, Plaintiff's precipitating injury seems to be a twisted ankle that she suffered on or around June 17, 2005 (*Id.* at 206) though some information

---

[2] On March 26, 2009, the Plaintiff resubmitted the two November 28, 2008 MRI reports and the letter from Dr. Ritz to the Appeals Council. (R. 14.)

in the record suggests that she experienced back and leg pain before then. (*See, e.g., Id.* at 267.) Fieldhouse claims that the illnesses, injuries or conditions that limit her ability to work include cellulitis in her right leg, a shifting disc in her back, and sciatica. (*Id.* at 162.) She explains that her back "goes out on [her] and [she] can barely walk." (*Id.*) She also says that she has trouble walking and has problems with her legs swelling up. (*Id.*) Plaintiff claims she stopped working because she was in too much pain from her leg and back condition to return to work. (*Id.*) Before her conditions made her leave her job, Plaintiff worked as a prep cook in a restaurant. (*Id.* at 163.)

Fieldhouse has taken Furosemide to prevent water retention, potassium and Klor-con to prevent leg cramps, (*Id.* at 166) and Lisinopril to treat hypertension. (*Id.* at 211.) She was prescribed Vicodin for her sprained ankle. (*Id.* at 207.) She was prescribed Levaquin, Unasyn, Vancomycin, and Gentamicin, in response to fever. (*Id.* at 211.) She has used over-the-counter medication for pain. (*Id.* at 193) She received a single cortisone injection in December of 2006. (*Id.* at 72-73.) She has seen Dr. Elizabeth Ritz ("Dr. Ritz") and Roger Miller ("Miller"), a chiropractor, for treatment. (*Id.* at 192.) Surgery has not been recommended for her back pain. (*Id.* at 58.)

## B.    Testimony and Medical Evidence

### 1.    *Fieldhouse's Testimony*

In the hearing before the ALJ, Fieldhouse said that she could not work because of her cellulitis, sciatica and a shifting disc in her lower back. (*Id.* at 74, 79.) She indicated that she has constant low back pain and constant right leg pain or right leg numbness. (*Id.* at 86.)  She explained that she cannot sit or stand for long periods of time, that it is hard to bend over, that she has a hard time sleeping at night, and that the maximum amount of weight that she could pick up at one time is five pounds. (*Id.* at 75-76, 78.) She also explained that when her disc shifts, she experiences a sharp pain and numbness in her leg that goes all the way to her toes, (*Id.* at 79-80) and that she experiences increased back pain when she lifts her arms. (*Id.* at 88.)

In terms of her daily activities, Fieldhouse testified that she usually gets up at 7:30 a.m. to get her son off to school, and then tries to do some housework. (*Id.* at 82.) She explained that she could only do a little bit at a time: "I will sit for five to ten to 15 minutes. I'll do a little bit of something, and then I'll go sit down and relax, and then I can't sit that long so I get up and walk around." (*Id.*) Plaintiff said that she fixes quick and easy meals and grocery shops for the family. (*Id.* at 84.) She said that she could take care of most of her personal hygiene needs, but that she sometimes needs help washing her hair, drying herself off, dressing herself and getting off of the toilet. (*Id.* at 85.)

## 2.    *Medical Evidence Before the ALJ*

### a.    treating physicians

Beginning in September 2005 Fieldhouse received treatment from Dr. Elizabeth Ritz ("Dr. Ritz"). (*Id.* at 178.) On September 2, 2005, Fieldhouse was admitted to Illinois Valley Community Hospital with a high fever, and right lower extremity edema and pain. (*Id.* at 211.) Dr. Ritz diagnosed Plaintiff with cellulitis and abscess of the leg. (*Id.* at 209.) She also provided secondary diagnoses of phlebitis and thrombophlebitis of superficial vessels of lower extremity, unspecified congestive heart failure, essential hypertension, unspecified hyperlipidemia, tobacco use disorder, morbid obesity, personal history of venous thrombosis and embolism, and fever. (*Id.*) Dr. Ritz found that Plaintiff had 3+ pitting edema bilaterally, and that her right lower extremity was erythematous to just below the knee. (*Id.* at 213.) A duplex and color-flow Doppler interrogation of the deep veins of the right lower extremity was performed; it showed normal flow augmentation, respiratory variation and compression from the proximal calf to the groin. (*Id.* at 241.) There was no evidence of a deep vein thrombosis. (*Id.*)

On a follow-up visit in November 2005, Dr. Ritz said that Plaintiff's cellulitis had resolved and that there were some hyper-pigmentation changes on her right lower extremity but no erythema. (*Id.* at 288.) Dr. Ritz suggested a sleep study due to Plaintiff's reports of daytime fatigue and poor sleep. (*Id.*) On December 9, 2005, Dr. Ritz reported that the sleep study results were normal. (*Id.* at 286.) A March 1, 2006 progress note indicates that Plaintiff returned to Dr. Ritz and complained of

leg swelling and "burning up" and a lump on her leg. (*Id.* at 285.) On March 13, 2006, Dr. Ritz indicated that Plaintiff's leg pain, warmth and erythema had resolved and that her cellulitis had resolved. (*Id.* at 284.) On July 24, 2006, Dr. Ritz noted that Plaintiff was in the process of applying for disability. (*Id.* at 308.) She reported that any strenuous activity bothered Plaintiff's back, and said that she would need MRI exam results to look for evidence of nerve impingement. (*Id.*) On September 6, 2006, Dr. Ritz reported that Plaintiff continued to have terrible back pain, especially after packing up her things and painting the house. (*Id.* at 310.)

On May 31, 2008, Plaintiff went to the emergency room at Utica Medical Center and complained of cellulitis of her left lower leg. (*Id.* at 312.) She said that she was mowing the lawn and may have been bitten. (*Id.*) Dr. Ritz found that Plaintiff had erythema extending from the left ankle up the leg. (*Id.* at 313.) On October 15, 2008, Plaintiff visited Dr. Ritz because of her back pain. (*Id.* at 314.) Dr. Ritz found that she had normal posture, 5/5 normal muscle strength, a stiff gait, and limited range of motion in the lower extremities. (*Id.* at 315.)

Dr. Ritz wrote two letters concerning Plaintiff's condition and capacity for work prior to the ALJ hearing. In her September 6, 2006 letter, Dr. Ritz explained that Plaintiff takes Ibuprofen three to four times a day to cope with pain in her lower back and right leg. (*Id.* at 309.) Dr. Ritz also said that Plaintiff's inability to work "results from constant pain in her lower back radiating down her right leg and into her toes with activity. Her ability to sit is limited to 15 to 20 minutes, and her ability to stand is limited to 10 to 15 minutes." (*Id.*) Dr. Ritz also noted that

Plaintiff has difficulty performing daily living activities due to her need to take frequent rest breaks to cope with her pain. (*Id.*) In her October 15, 2008 letter, Dr. Ritz said that Plaintiff's condition was gradually worsening as evidenced by Plaintiff's report of intensified chronic pain. (*Id.* at 318.) Dr. Ritz explained that, "[g]iven her difficulties in performing even simple tasks, Ms. Fieldhouse continues to be unable to work." (*Id.*)

Beginning on November 17, 2004, Fieldhouse received treatment from Roger Miller, a chiropractor. (*Id.* at 270.) During Plaintiff's consultation, Miller noted her complaints. (*Id.* at 267.) On December 29, 2005, Miller diagnosed Plaintiff with "possible lumbar disc herniation resulting in chronic sciatic radiculopathy." (*Id.* at 266.) Miller recommended that Plaintiff "have an MRI to rule out her sciatica / disc possibilities." (*Id.*) Miller opined that "it will be very difficult for [Fieldhouse] to do any occupation w/ her spinal disc problems w/o acute exacerbations." (*Id.*) In terms of his objective findings, Miller wrote, "see notes."[3] (*Id.*) On May 17, 2006, Miller diagnosed Plaintiff with "possible lumbar disc herniation w/ resultant sciatic radiculopathy and severe leg and back spasms." (*Id.* at 301.) Miller's objective findings included "subluxation L5-S1[,] sacroiliac dysfxn.+ Minor's sign, rigid @ L bilaterally." (*Id.*) Miller said that "Mrs. Fieldhouse is very restricted in her employment future. Lifting/bending will cause more damage. Sitting will also cause subjective sciatic exacerbations. A neurological exam is recommended." (*Id.*)

---

[3] It is unclear to what notes Miller is referring.

### b.    examining, non-treating physicians

On March 2, 2006, Plaintiff underwent a consultative internal medicine examination, performed by Dr. Phillip Budzenski ("Dr. Budzenski"). (*Id.* at 276.) Dr. Budzenski found that Plaintiff was able to bend over and attend to footwear without difficulty, and was able to get on and off the examination table without difficulty. (*Id.* at 277.) He reported that she ambulated with a mildly wide-based gait appropriate for body habitus, that her gait was not unsteady, lurching or unpredictable, and that she appeared comfortable in the seated and supine positions. (*Id.*) Dr. Budzenski's examination of Plaintiff's neck revealed no thromegaly, thyroid bruits, lymphadenopathy, or other palpable masses. (*Id.*) In terms of Plaintiff's chest, the doctor found that there was symmetrical excursion, no increased A/P diameter, and no accessory muscle use; however, he did find that the chest examination was notable for moderate mid-thoracic kyphosis. (*Id.*)

Dr. Budzenski noted that there were no venous stasis changes such as pigmentation, ulceration, or brawny edema. (*Id.* at 278.) He did find that Plaintiff exhibited a 3-plus pitting edema bilaterally, and that there was a mild diffuse redness associated with the skin in the leg below the knee on the right; there was no evidence for infection, and there was no excess heat generated from the site. (*Id.*) Dr. Budzenski also noted that Plaintiff was not wearing her recommended surgical stockings. (*Id.*)

Dr. Budzenski reported that examination of the cervical spine revealed no tenderness in the spinous processes or paravertebral muscle spasm. (*Id.*) He found

that flexion of the cervical spine was limited to forty degrees, that extension of the cervical spine was limited to forty-five degrees, that lateral bend was preserved to forty-five degrees bilaterally, and that rotation was limited to seventy degrees bilaterally. (*Id.*) His examination of the dorsolumbar spine showed no apparent kyphosis or scoliosis; there was also no paravertebral muscle spasm or tenderness to palpation of the spinous processes. (*Id.*) Examination of the shoulders, elbows and wrists revealed no crepitus, tenderness, erythema, warmth, swelling or nodules. (*Id.*) Forward flexion of the arms and abduction of the extended arms were limited to 135 degrees bilaterally, and adduction was limited to twenty degrees bilaterally (*Id.*)

Dr. Budzenski's examination of Plaintiff's hips revealed no tenderness or atrophy. (*Id.* at 279.) Adduction was limited to ten degrees bilaterally, and internal rotation was limited to thirty degrees. (*Id.*) Foot and ankle examination revealed moderate to marked swelling bilaterally. (*Id.*) Dorsiflexion was limited to fifteen degrees bilaterally, and plantar flexion was limited to thirty degrees bilaterally. (*Id.*) Dr. Budzenski found Plaintiff's reflexes to be brisk and symmetrical, and her motor strength to be normal. (*Id.*)

Dr. Budzenski concluded that Plaintiff was morbidly obese, had a history of cellulitis in the right lower extremity, had lower extremity edema (and was non-compliant with surgical stocking recommendations for both the cellulitis and the edema), had thoracis kyphosis, and abused tobacco (and was non-compliant with cessation recommendations). (*Id.* at 280.) In terms of her back, he determined that

"there was no deficit in range of motion [of] her lumbar spine but claimant does exhibit at least a moderate mid thoracic kyphosis. She has symmetric reflexes. She has no sensory loss. There is no apparent muscle atrophy or motor loss." (*Id.*) Regarding her workplace, he suggested that Plaintiff avoid extreme heat, and would not have her climb ladders, ropes, or scaffolding. (*Id.*) He also said that Plaintiff should only use stairs occasionally, advised that Plaintiff may need her workplace adjusted for body habitus, and limited her lifting to fifty pounds at any one time. (*Id.*)

### c.    non-examining physicians

Following Dr. Budzenski's examination of Plaintiff, Dr. Sandra Bilinsky ("Dr. Bilinsky") completed a Physical Residual Functional Capacity ("RFC") Assessment. (*Id.* at 292-99.) Based on Dr. Budzenski's findings, Dr. Bilinsky determined that Plaintiff is limited to light work with postural and environmental limitations. (*Id.* at 299.) She reported that Plaintiff may occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday. (*Id.* at 293.) She determined that Plaintiff may frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but may never climb ladders ropes or scaffolds. (*Id.* at 294.) She also found that Plaintiff should avoid concentrated exposure to extreme heat. (*Id.* at 296.)

### 3. Plaintiff's New Evidence

Ten days after the ALJ Hearing, on November 28, 2008, Plaintiff had a thoracic spine MRI and lumbar spine MRI done. (*Id.* at 47-50.) The results of the thoracic spine MRI showed that "[t]here is a slight leftward rotatory scoliotic curvature at the upper thoracic spine centered at approximately T3-4. Osseous signal is normal throughout. Disc Dessication is present at each level in the thoracic spine. There are disc bulges at T4-T5 through T11-12 most significantly at T5-6 and T6-7." (*Id.* at 47.) The results also showed a slight right paramedian disc bulge at T4-T5, a central disc bulge at T5-6, a left paramedian focal disc herniation which contacts the cord and flattens the anterior left aspect of the cord at T6-7, a minimal central disc bulge at T7-8, a right paramedian flattening of the ventral thecal sac at T8-9, and a minimal central/left paramedian disc prominence at T9-10. (*Id.*)

The results of the lumbar spine MRI showed "[d]isc dessication L4-5. The remaining lumbar intervertebral discs have normal hydration. Mild loss of intervertebral disc space height at L4-5. Disc extrusion at L4-5. Developmentally the AP canal dimension is within limits. Conus terminates at T12-L1. Osseous signal is normal throughout." (*Id.* at 49.) The results also showed a minimal disc bulge with a preserved concavity to the ventral thecal sac at L2-3, and a "broad-based disc bulge with an extrusion of nucleus in a right paramedian location extending inferiorly towards the upper half of the L5 vertebral body,"[which] narrows the right lateral recess and possible brushes the right L4 nerve root within the sheath or as it is queued to the neural foramen." (*Id.*)

On January 16, 2009, Dr. Ritz wrote a letter on Plaintiff's behalf regarding the November 28, 2008 MRI results. She said that "the results of this MRI revealed multiple herniated and bulging discs of the thoracic and lumbar spine. Such findings are consistent with [Plaintiff's] chronic pain complaints." (*Id.* at 25.)

## C. ALJ Decision

In his findings, the ALJ stated that Fieldhouse last met the insured status requirements of the Social Security Act on June 30, 2008, and further found that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of June 17, 2005 through her date last insured. (*Id.* at 56.) The ALJ determined that Plaintiff suffered from the following severe impairments: morbid obesity and degenerative disc disease. (*Id.*) He found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled on of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Fieldhouse had the residual functional capacity "to perform sedentary work . . . but is limited to work activity that allows for a sit/stand option with no climbing of ladders, ropes or scaffolds; and only occasional balancing, stooping, crouching, crawling, or kneeling. The claimant is limited to work activity involving no concentrated exposure to extreme heat." (*Id.* at 57.) After considering the evidence, the ALJ found that "the claimant's medically determinable

impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (*Id.* at 58.)

The ALJ recited Plaintiff's relevant medical history, her answers to the Activities of Daily Living Questionnaire, and portions of her testimony. (*Id.* at 58-60.) He found that Plaintiff lacked credibility as her daily activities, use of medication, treatment and non-compliance with medical advice are inconsistent with her subjective complaints. (*Id.*) He accorded little weight to Miller's opinion because it was unaccompanied by a functional assessment or references to any problems with functionality that could support the conclusion that Plaintiff "could not do any occupation due to disc problems." (*Id.* at 59.) The ALJ also accorded little weight to Dr. Ritz's opinion because the doctor's own reports "fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled." (*Id.* at 60.) The ALJ noted that Dr. Ritz's opinion was without substantial support from other evidence in the record, and that the doctor relied almost exclusively upon Plaintiff's subjective complaints. (*Id.*) Specifically, the ALJ pointed out that there were no reports from any MRI exams that could support the doctor's conclusions. (*Id.*) The ALJ also determined that Dr. Ritz's opinion deserved less weight because Dr. Ritz had not recommended surgery or treatment at a pain clinic, which the ALJ found to be inconsistent with the totally disabling limitations that Dr. Ritz reported. (*Id.*)

The ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.* at 61.) He determined that Plaintiff is a younger individual age 45-49, has a high school education, and is able to communicate in English. (*Id.*) Based on Plaintiff's RFC and the vocational expert's testimony, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including production inspection (350 jobs in Illinois), hand assembler (1,200 jobs in Illinois), and material handler (2,000 jobs in Illinois). (*Id.* at 62.) The ALJ determined that Plaintiff was not under a disability ay any time from June 17,2005 through June 30, 2008. (*Id.*)

D.    **The Appeals Council Decision**

In its June 2, 2009 decision, the Appeals Council stated that it notified Plaintiff that it would consider any comments or new and material evidence that Plaintiff or her representative submitted. (*Id.* at 21.) The Appeals Council reported that "[n]o comments or additional evidence have been received." (*Id.*) The Appeals Council adopted the ALJ's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings, and Acquiescence Rulings, the issues in the case, and the evidentiary facts. (*Id.*) The Appeals Council also adopted the ALJ's findings or conclusions regarding whether Plaintiff was disabled. (*Id.*)

> The Appeals Council agrees with the ALJ's findings under steps 1, 2, 3, 4, and 5 of the sequential evaluation; namely that the claimant has not engaged in substantial gainful activity since June 17, 2005, that the claimant has severe impairments which do not meet or equal in severity an

15

> iompairment in the Listing of Impairments, that she is not capable of performing past relevant work and that there are a significant number of jobs the claimant is capable of performing.

(*Id.*) The Appeals Council did not agree with the ALJ's finding that Plaintiff's last date insured was June 30, 2008. (*Id.* at 21-22.) The Appeals Council determined that Plaintiff's last date insured is September 30, 2008. (*Id.* at 22.) The Appeals Council found that Plaintiff was "not entitled to or eligible for a period of disability or disability insurance benefits under sections 216(I) and 223, respectively, of the Social Security Act." (*Id.* at 23.)

After the Appeals Council issued its decision, it received a request to reopen and change the decision. (*Id.* at 7.) The Appeals Council found no reason under the rules to reopen and change the decision. (*Id.*) The Appeals Council's June 2, 2009 decision became the final decision of the Commissioner. (*Id.*)

# DISCUSSION

## I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any

conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.   ANALYSIS

Plaintiff argues for remand based on the existence of new medical evidence not previously considered by the ALJ or the Appeals Council. Additionally, Plaintiff argues that remand is necessary for several other reasons: (1) the ALJ failed to consider some of Plaintiff's impairments; (2) the ALJ's credibility determination was flawed; (3) the ALJ improperly weighed medical opinions and evidence.

### A.   **New Medical Evidence**

Sentence six of 42 U.S.C. § 405(g) "permits the Court to remand a case to the Commissioner 'upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Bush v. Astrue*, 571 F. Supp. 2d 866, 874 (N.D. Ill. 2008) (quoting 42 U.S.C. § 405(g)).

### 1. New

Evidence is considered "new" for purposes of sentence six if it was "not in existence or available to the plaintiff at the time of the administrative proceeding." *Schmidt v. Barnhart*, 395 F.3d 737, 741-42 (7th Cir. 2005). Here, Plaintiff's MRI results and Dr. Ritz's letter were not in existence at the time of the ALJ hearing or at any point before the ALJ issued his decision on November 12, 2008. Plaintiff's MRIs were performed on November 28, 2008, and Dr. Ritz's letter was not written until January 16, 2009. Accordingly, the Court finds that the medical evidence satisfies the definition of "new."

### 2. Material

Evidence is considered "material" for purposes of sentence six if there is a "reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt*, 395 F.3d at 742. Further, the evidence must relate to the claimant's condition "during the relevant time period encompassed by the disability application under review. *Id.*

Defendant argues that since the MRI exams were performed almost two months after September 30, 2008, the test results do not purport to describe Plaintiff's condition prior to that date. Defendant also explains that Dr. Ritz's letter does not relate her findings back to the relevant time period, and argues that November 28, 2008 MRI exams do not and cannot support Dr. Ritz's opinions of September 6, 2006 and October 15, 2008. Defendant is right that medical records that "speak only to the applicant's current condition, not to his condition at the time

his application was under consideration by the Social Security Administration" are not considered material. *Id.* Here, however, the very short amount of time elapsed between Plaintiff's last date insured and the MRI exams, the nature of the findings, and the content of Dr. Ritz's letter all suggest that the evidence, while postdating the ALJ's decision, "speaks to the patient's condition at or before the time of the administrative hearing." *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008). Clearly, the disc dessication present at each level in the thoracic spine and L4-5, slight leftward rotatory scoliotic curvature at the upper thoracic spine, disc bulges at T-4-5 through T11-12, mild loss of intervertebral disc space height at L4-5, disc extrusion at L4-5, and other findings did not all occur in the time between September 20, 2008 and November 28, 2008. *See Bush*, 571 F. Supp. 2d at 875 (holding that tests completed within three months of the ALJ's decision that documented impairments of which the plaintiff had complained for years were material). Additionally, Dr. Ritz's letter, most reasonably interpreted, indicates that the results of the MRI exams were consistent with the chronic pain complaints Plaintiff expressed to Dr. Ritz prior to September 20, 2008. (R. 25.)

In his decision, the ALJ noted that Dr. Ritz's opinion was "without substantial support from the other evidence of record" and that there was "no report from any MRI that could support Dr. Ritz's conclusions." (*Id.* at 60.) There is a reasonable probability that the ALJ would have reached a different conclusion had the MRI exams and Dr. Ritz's letter been considered. "The new medical evidence fills certain gaps in the record that concerned the ALJ, and provides documentation

of specific impairments." *Bush*, 571 F. Supp. 2d at 875. Therefore, the Court finds this new evidence material.

### 3.      *Good Cause*

The final element to be satisfied for remand under sentence six of section 405(g) requires that the Plaintiff show good cause for her failure to submit the medical records prior to the ALJ's decision. *Id.* at 876. Plaintiff claims that she could not afford MRI exams and that her large size dissuaded her as well. Defendant maintains that these explanations are insufficient. Defendant explains that neither Plaintiff's poverty nor her obesity excuse her failure as there is "no indication that Plaintiff was not as large at the time of the MRIs on November 28, 2008" and "no explanation how Plaintiff was able to afford MRIs on November 28, 2008." (Def.'s Resp. P. 12.) Admittedly, Plaintiff does a questionable job of developing her argument; nevertheless, the record does support her claim that she could not afford the exams. (R. 310.) That she was able to pay for the exams later does not necessarily mean that her excuse is deficient. In *Stubbs v. Apfel*, No. 97 C 7069, 1998 WL 547107 (N.D. Ill. Aug. 20, 1998), the evidence did not exist until after the ALJ issued his opinion due to the claimant's inability to afford the tests earlier. Thus, the court held, there was clearly good cause for the claimant's failure to submit the evidence to the ALJ. *Id.* at *11.

The good cause requirement "is indicative of congressional intent to prevent bad faith manipulation of the administrative process." *Id.* (citing *Creighton v. Sullivan*, 798 F. Supp. 1359, 1363 (N.D. Ind. 1992)). The record and the facts before

this Court do not provide any indication that Plaintiff withheld the evidence in question "in an attempt to sandbag the Defendant." *Id.* (citing *Sears v. Bowen*, 840 F.2d 394, 399-400 (7th Cir. 1988)). In fact, the record indicates the opposite. On January 16, 2009, Plaintiff submitted the MRI exam results to the Appeals Council along with her Request for Review of Hearing Decision.[4] (R. at 44-50.) However, in its decision the Appeals Council stated that "[n]o comments or additional evidence have been received." (*Id.* at 21.) Had the Appeals Council considered the new evidence when it reviewed the ALJ's decision,[5] a remand under sentence six of section 405(g) would not be proper. *Lloyd v. Sec. of Health & Human Serv's*, 876 F. Supp. 996, 1011 (N.D. Ill. 1995). Plaintiff submitted the materials in the course of the administrative proceedings, but for whatever reason, the Appeals Council failed to acknowledge that new evidence had been submitted. Clearly, there has been no bad faith manipulation of the administrative process. The Court finds that Plaintiff has established that there was good cause for her failure to submit the new evidence before the ALJ issued his decision.

As Plaintiff has satisfied the criteria for a remand under sentence six of section 405(g), the Court will remand the case for consideration of Plaintiff's new medical evidence. For the sake of completeness, the Court finds it prudent to

---

[4] The Plaintiff also submitted a letter from Dr. Ritz on February 9, 2009, (R. 24) and re-submitted all of the new evidence on March 26, 2009. (R. 14.)

[5] The regulations "require the Appeals Council to review new evidence if the evidence is 'material' and 'relates to the period on or before the date of the administrative law judge hearing decision.'" *Rice v. Apfel*, 8 F. Supp. 2d 769, 775 (N.D. Ill. 1998) (quoting 20 C.F.R. § 416.1470(b)).

consider Plaintiff's remaining arguments for remand pursuant to sentence four of Section 405(g). *See Bush*, 571 F. Supp. 2d at 877.

### B. Impairments Unconsidered

When determining a disability claimant's RFC, "the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'" *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(2), (b), (c)). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

Plaintiff claims that the ALJ erred in omitting her leg impairments and in not linking her obesity to her other impairments. Plaintiff is mistaken. The ALJ considered Plaintiff's cellulitis and abscesses explicitly. (R. 59-60.) While the record reflects that Plaintiff was diagnosed secondarily with phlebitis and thrombophylebitis of superficial vessels of lower extremity on or around September 9, 2005, (*Id.* at 209) the ALJ noted that a subsequent Doppler scan showed no evidence of deep vein thrombosis. (*Id.* at 289.) The ALJ also considered Plaintiff's obesity in combination with her other impairments and determined that Plaintiff was capable of performing sedentary work with a sit/stand option, only occasional balancing, stooping, crouching, crawling, or kneeling, no exposure to extreme heat, and no climbing of ladders, ropes, or scaffolds. (*Id.* at 57, 60.)

## C.    <u>Credibility</u>

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)) ("'Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."'). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."' *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88). When assessing the credibility of an individual's statements about pain or other symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[6]

Plaintiff argues that in assessing her credibility, the ALJ relied solely on the ADL Questionnaire dated December 1, 2005 and neglected the rest of the case record. However, in addition to citing the Questionnaire, the ALJ also relied upon

---

[6] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency.  20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

the representations that Plaintiff made about her daily activities during the hearing. Specifically, the ALJ noted that, "[d]uring the hearing, the claimant testified she gets her son ready for and off to school every day. She goes grocery shopping without any particular assistance. She is able to drive, transport her child, and do housework." (R. 58.) Additionally, the ALJ properly considered Plaintiff's use of medication and course of treatment. He said that the "claimant's use of medications does not suggest the presence of an impairment which is more limiting than found in this decision. The claimant testified she takes over-the-counter medication for pain." (*Id.*) He explained that "[a]lthough the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature. The claimant has not been recommended for surgery for her back pain." (*Id.*) The ALJ also found that there was evidence that Plaintiff had not been compliant in following medical advice, suggesting "that the symptoms may not have been as limiting as the claimant has alleged." (*Id.*) In light of the foregoing, the ALJ properly assessed Plaintiff's credibility.

### D.  Consideration of Medical Evidence and Opinions

On issues that are not reserved to the Commissioner, a treating doctor's opinion "receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Id.* (quoting *Martinez*

26

*v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011))..

Plaintiff claims that the ALJ erred in not accepting the limitations of Dr. Ritz and Dr. Miller. Plaintiff's argument is not compelling. First, Roger Miller is a chiropractor and is therefore considered an "other source," as opposed to an "acceptable medical source," pursuant to 20 C.F.R. § 404.1513(d)(1). The ALJ explained that Miller's opinion was unaccompanied by a functional assessment or references to any problems with functionality that could support Miller's conclusion that it would be difficult for Plaintiff to perform any work due to disc problems. (R. 59.) The ALJ was justified in giving the Chiropractor's opinion little weight. *Bloom v. Astrue*, 714 F. Supp. 2d 938, 953 (N.D. Iowa 2010).

Second, the ALJ provided "good reasons" for discounting the opinion of Dr. Ritz. *Scott*, 647 F.3d at 739. The ALJ explained that the doctor's own reports "fail to reveal the type of significant clinical and laboratory abnormalities one would expect of the claimant were in fact disabled." (R. 60.) He also noted that Dr. Ritz seemed to rely heavily on Fieldhouse's subjective complaints and uncritically accepted most, if not all, of what Plaintiff reported. (*Id.*) Furthermore, the ALJ found the severity of the doctor's findings to be inconsistent with the fact that Dr. Ritz had not recommended surgery or treatment at a pain clinic. (*Id.*) The ALJ also pointed out that there was no MRI exam results that supported Dr. Ritz's conclusions.[7] (*Id.*) The ALJ was not required to accept Dr. Ritz's opinion because it was not well supported.

---

[7] That there may be such results now does not undermine the ALJ's initial determination.

### E. Miscellaneous Complaints

In addition to what seem to be Plaintiff's primary concerns with the ALJ's decision, she also makes a variety of additional arguments that allegedly require remand. All of Plaintiff's additional arguments are unpersuasive.

First, Plaintiff claims that the ALJ's finding that Plaintiff was last insured as of June 30, 2008 indicates that the ALJ was inattentive to the details of the case. The Appeals Council found that the claimant's date last insured was September 30, 2008. (*Id.* at 22.) The ALJ made a mistake.[8] The Appeals Council rectified it. If the ALJ was otherwise inattentive and made other mistakes, remand may be necessary based on them; however, remand based on the assumption that the existence of one mistake indicates others is unreasonable.

Second, Plaintiff claims that, absent any evidence, the ALJ found that Plaintiff worked after her alleged onset date of June 17, 2005. Plaintiff complains that such a finding needlessly questioned her credibility. Defendant admits that the basis for the ALJ's conclusion is unclear, but explains that the finding was inconsequential as the ALJ clearly found that any work activity performed after the alleged onset date did not constitute substantial gainful activity. As such, the ALJ's finding did not deny Plaintiff's claim at step one of the sequential evaluation. Had the ALJ relied upon the mysterious work activity in order to call Plaintiff's

---

[8] According to Defendant, the ALJ apparently relied on a query performed about ten days prior to the hearing that showed that Plaintiff last met the insured requirements in June 2008.

credibility into question or determine Plaintiff's capabilities or functional limitations, remand might be necessary. Here, the ALJ did no such thing. Even if the finding was the result of another mistake, it was harmless.

Third, Plaintiff claims that the ALJ's omission of the Dr. Budzenski's findings that Plaintiff's chest has symmetrical excursion, that her foot and ankle examination was notable for moderate to marked swelling bilaterally, and that Plaintiff might need her workplace adjusted for body habitus requires remand. Plaintiff ignores that the ALJ did consider Plaintiff's marked swelling. (R. 60.) Plaintiff also ignores that the ALJ's RFC determination did factor in workplace adjustments necessary for Plaintiff's size and other limitations. (*Id.*) And while Plaintiff claims that symmetrical excursion of the chest is a departure or deviation according to MOSBY'S MEDICAL, NURSING & ALLIED DICTIONARY, this actually does not seem to be the case. *See Sites v. Commissioner of Social Security*, No. 2:09cv26, 2010 WL 3463863, at *9 (N.D. W. Va. Aug. 4, 2010) (treating symmetrical excursion of the chest as normal); *Wheeler v. Astrue*, No. 5:08cv164, 2009 WL 4666453, at *10 (N.D. W. Va. Dec. 7, 2009) (same). Furthermore, despite these findings, Dr. Budzenski determined that Plaintiff could perform a wider range of work than that ultimately found by the ALJ.

Fourth, Plaintiff argues that the ALJ misconstrued Plaintiff's testimony by stating that the RFC of sedentary work with a sit/stand option was–to some extent–based on the claimant's own testimony that she could rotate between sitting and standing all day long. (R. 62.) During the hearing, Plaintiff explained that when

she tries to do housework, she can only "do a little bit at a time. I will sit for five to ten to 15 minutes. I'll do a little bit of something, and then I'll go sit down and relax, and then I can't sit that long so I get up and walk around." (*Id.* at 82.) The ALJ then asked, "[s]o you spend most of your time during the day rotating between sitting and standing?" (*Id.* at 83.) Plaintiff answered, "yes." (*Id.*) The ALJ's interpretation was not unreasonable.

The findings of the Commissioner are supported by substantial evidence; as such, the Court finds that remand pursuant to sentence four of 42 U.S.C. § 405(g) is inappropriate. However, the Court concludes that the matter must be remanded to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g) for a thorough consideration of the entire record in light of the new medical evidence. The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and his ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000)*; Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994). The Commissioner should not assume that any other errors not discussed in this order have been adjudicated in his favor. On remand, the Commissioner therefore must carefully articulate his findings as to every step.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 23] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner so that new evidence may be considered. for further proceedings consistent with this opinion.

SO ORDERED.                    ENTERED:

**DATE: <u>February 8, 2012</u>**

_____

**HON. MARIA VALDEZ**
**United States Magistrate Judge**