IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANINE L. FIELDHOUSE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 09 C 6358 |
| v. | ) |
| | ) Magistrate Judge |
| CAROLYN W. COLVIN, Acting | ) Maria Valdez |
| Commissioner of Social Security,[1] | ) |
| | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Janine L. Fieldhouse's claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment [Doc. No. 42] is granted, and the matter is remanded for proceedings consistent with this Opinion.

## BACKGROUND

### I. PROCEDURAL HISTORY

On November 17, 2005, Plaintiff filed a claim for Disability Insurance Benefits ("DIB"), claiming disability since June 17, 2005 due to cellulitis, back trouble, and sciatica. (R. 138, 162.) Her date last insured under the DIB program

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

was September 30, 2008. After various levels of administrative review, her claim was denied, and Plaintiff appealed that denial to this Court on June 9, 2010. *See Fieldhouse v. Astrue,* No. 09 C 6358, 2012 WL 426702 at *1 (N.D. Ill. Feb. 8, 2012). In 2012, the Court held that the ALJ's findings were supported by substantial evidence. *Id.* at *14. Nevertheless, the court vacated the Commissioner's earlier decision and granted remand pursuant to sentence six of 42 U.S.C. § 405(g), which allows for the consideration of new and material evidence where there is "good cause for the failure incorporate the evidence into the record in a prior proceeding." *Id.* at *8-11.

In preparation for her new hearing, Plaintiff submitted additional evidence. (R. 614-646.) Another hearing was held on December 19, 2012 before a second ALJ, who on January 7, 2013 again denied Plaintiff's claim, finding that she was not disabled from her alleged onset date to her date last insured. Plaintiff now contests that finding.

## II.    FACTUAL BACKGROUND

### A.    Background

Plaintiff was born on July 2, 1960 and was forty-eight years old as of her date last insured and fifty-two years old at her December 2012 hearing. She completed high school in special education classes and has worked as nursing assistant and as a part-time cook. (R. 163, 276, 361, 382.) She is married and has one son, who was sixteen years old at the time of the hearing. (R. 359.)

B.  **Medical Evidence**

1.  **Treating Sources**

Throughout the relevant period, Plaintiff received primary care from Dr. Elizabeth Ritz and from Dr. David Schlagheck. In September 2005, Plaintiff was hospitalized for a week due to cellulitis in her leg, which was treated with antibiotics and steroids. (R. 209-22, 290.) She followed up with Dr. Ritz about cellulitis and lymphedema in October, November, and December 2005. (R. 286-91.) Dr. Ritz examined Plaintiff on March 13, 2006 and determined that her cellulitis had resolved, but she still had lymphedema requiring the use of compression hose. (R. 307.) In January 2006, she reported leg cramps. (R. 317.) A week later, she stated that excessive stooping had caused her back pain. *(Id.)*

On July 24, 2006, Plaintiff complained to Dr. Ritz of abdominal symptoms. She also reported that she was in the process of applying for disability for low back pain and radiculopathy, which was treated by her chiropractor. Dr. Ritz noted that "any strenuous activity" like playing with her son bothered Plaintiff's back. Though both her chiropractor and her physician recommended an MRI, Plaintiff chose not to get one because she would have to pay for it herself, and her "lawyer does not feel she needs [an] MRI to get disability." (R. 307.)

Plaintiff next reported "terrible back pain," worsened by packing and painting in preparation for a move, on September 6, 2006. She stated that she took ibuprofen three or four times a day with some relief, and also needed frequent rest breaks to cope with the pain. (R. 310.) That day, Dr. Ritz wrote a "to whom it may

3

concern" letter indicating that Plaintiff had been her patient for approximately two years and that Plaintiff had back pain and right sciatic nerve pain which was treated with ibuprofen three times a day. She had "constant" low back pain radiating down into her right leg and toes with activity, and she could sit for only fifteen to twenty minutes at a time and stand for only ten to fifteen minutes at a time. Her pain compromised her activities of daily living and required her to take frequent rest breaks. (R. 309.)

On September 25, 2006, Plaintiff again reported low back pain shooting down her right leg during the week she was moving to a new place. (R. 311.) Dr. Ritz observed a positive straight leg test and prescribed 800 milligrams of ibuprofen, plus Vicodin. (*Id.*) On December 21, 2006, Plaintiff visited Family Heath Center, seeing Dr. Schlagheck for a "flare-up" of her back pain. (R. 629.) Dr. Schlagheck prescribed Celebrex and Ultram, and in January 2007, he treated her back pain with a lumbar steroid injection. (R. 630.)

In February 2007, Dr. Ritz noted that Plaintiff had back pain and bruised ribs from a fall. On December 2007, Plaintiff again returned to Dr. Ritz, reporting that she had again hurt her lower back while moving to a new house. (R. 317.) In May 2008, she had an episode of cellulitis in her lower leg, which was again treated with antibiotics. Plaintiff stated she may have been bitten while mowing the lawn. (R. 312.)

Plaintiff saw Dr. Schlagheck once in 2008, for a spell of vertigo. In October 2008, two weeks after the date she was last eligible for DIB and one week before her

4

ALJ hearing, Plaintiff returned to Dr. Ritz to follow up about her back pain, which she reported was worsened by prolonged sitting or standing, and relieved by rest. Dr. Ritz observed limitations and pain in her ranges of motion. (R. 314-15.) That day, Dr. Ritz wrote a second letter, stating that Plaintiff's condition was "gradually worsening as she reports that her chronic pain has increased in intensity." She wrote that Plaintiff's pain affected her ability to sleep and to engage in daily activities. (R. 318.)

Plaintiff had MRIs taken of her lumbar and thoracic spine on November 29, 2008. Her thoracic spine MRI results described "a slight leftward rotatory scoliotic curvature at the upper thoracic spine centered at approximately T3–4," along with disc desiccation that was "present at each level of the thoracic spine," with abnormalities described at all levels, including a T6–7 "left paramedian focal disc herniation which contacts the cord and flattens the anterior left aspect of the cord." (R. 618.) The lumbar spine MRI showed several findings at L4–5, including "disc desiccation with extruded nucleus," which "contributes to narrowing the right lateral recess and may be contacting the queued right L4 nerve root at the entrance to the neural foramen." (R. 619.) On January 16, 2009, Dr. Ritz wrote a third letter, this time opining that Plaintiff's MRI results were consistent with her pain complaints. (R. 622.)

Plaintiff first visited pain management specialist Dr. Ronald Kloc on December 5, 2008, one week after her MRIs and less than three months after her date last insured. (R. 625-26.) Dr. Kloc's notes contain a description of the MRI

5

scans listing multiple areas of "disc desiccation and bulging," including a notation that "the most severe level appears to be at T6–7 on the left where there is actual cord contact, displacement and slight deformity." (R. 625.) Dr. Kloc's physical exam revealed pain on back extension and flexion and right rotation, and pain on the right leg straight raise test. (*Id.*) Dr. Kloc opined that Plaintiff's right leg radicular pain was the most serious problem requiring attention first, with the goal of allowing Plaintiff to return to work. (R. 626.) On Plaintiff's sole return visit to the pain clinic in January 2009, Dr. Kloc performed an lumbar epidural steroid injection. (R. 627.)

Plaintiff continued to receive primary care from Dr. Schlagheck in the years following her date last insured. Records document treatment for back pain in June 2009 and March 2010 and ongoing treatment for chronic pain, cellulitis, and other ailments through 2012. (R. 629-40.)

Throughout the relevant period, Plaintiff also received periodic care from chiropractor Roger Miller. On November 17, 2004, after Plaintiff had hurt herself in a fall, Miller noted that she had limited ranges of motion; pain on cervical rotation, flexion, or extension; and sharp lower-back pain with Lasegue's and Braggard's tests. (R. 267, 270-71.) Plaintiff reported pain levels that ranged 6-10/10 in her upper back that sometimes travelled to her neck with occasional headaches. She also reported pain at 7-10/10 in her lower back, occasional numbness in both hands, and right-side sciatic pain. (R. 267.) She returned for approximately fifteen chiropractic treatments from December 7, 2004 to June 3, 2005, reporting varying

6

pain levels and, at times, leg cramps. (R. 268-69.) In May 2005 she reported that her lower back pain was improved "as long as I'm careful." At her last documented visit, on June 3, 2005, Plaintiff indicated that she had strained her back but was not experiencing severe pain. (R. 269.) In a December 29, 2005 "Progress Report" to a state agency, Miller reported that he had last seen Plaintiff in April 2005, that Plaintiff had a history of sciatica and low back pain, and that he had recommended an MRI. He opined that it would be very difficult for Plaintiff to do any occupation without acute exacerbations. (R. 266.) A second progress report completed by Miller on May 17, 2006 stated that he had last seen Plaintiff in January 2006 and opined that she would continue to have acute onsets of low back pain and sciatica, and that lifting and bending would cause more damage. (R. 301.)

    2.    **Consulting Physicians**

In connection with Plaintiff's application for benefits, Dr. Phillip S. Budzinski performed a consultative examination of Plaintiff on March 3, 2006, more than two years prior to her later MRI scans. A lumbar x-ray that he ordered was unremarkable. (R. 281.) He noted that, despite a recommendation that Plaintiff wear surgical stockings to control her lymphedema, she was not wearing them the day he examined her. (R. 276.) She had no difficulty bending to attend to her footwear. (R. 277.) She had moderate thoracic kyphosis (excessive forward curvature of the upper spine) but normal ranges of motion in her lumbar spine. (R. 279.) He noted pitting edema in both legs, marked swelling in both feet and ankles, some redness below the right knee, and limited ranges of motion, particularly in the

cervical area. (R. 278.) Noting a discrepancy between dynamometer grip strength tests and subjective assessments, Dr. Budzinsky performed further tests and assessed a grip strength of 5/5 bilaterally. His diagnostic impressions were morbid obesity, a history of cellulitis, lower extremity edema, thoracic kyphosis, and tobacco abuse. (R. 280.) He opined that Plaintiff could climb stairs only occasionally; should avoid extreme heat; could not climb ladders, ropes, or scaffolds; and should be limited to lifting no more than fifty pounds. (*Id.*)

Agency Reviewer Sandra Bilinsky, M.D. reviewed Plaintiff's file on March 27, 2006 and opined that, based on obesity, a history of cellulitis and edema, and alleged low back pain, Plaintiff should be limited to light work with some postural and environmental limitations. (R. 299.) This assessment was later confirmed by Dr. Ramakrishna Madala, M.D. (R. 302-04.)

In December 18, 2012, before Plaintiff's second hearing, neurologist George E. DePhillips, M.D. provided an opinion letter based on his review of the images from her November 2008 MRI scans and her later scans from December 2010. (R. 641-46.) Dr. DePhillips agreed with earlier assessments of the MRI exams. He concluded that Plaintiff's degenerative disc disease was consistent with "predominantly mechanical low back pain worse with activities" and "potential" for "radicular lower extremity symptoms." He also wrote, that, in "all probability, [Plaintiff] would have experienced such symptomatology since at least June 2005 consistent with her history." (R. 642.)

C.   **Plaintiff's Testimony**

At her hearing on December 19, 2012, Plaintiff testified that, during the period of time when she left her job in 2005 to the time before her MRI in 2008, her pain was at 10/10 and shifted to both sides of her lower back, traveling down her leg. (R. 363.) She stopped seeing the chiropractor because it was expensive and only helped for three days. (R. 363, 365.) She finally got an MRI at the suggestion of the first ALJ, which cost her $1,000 out of pocket. (R. 364.) Her steroid injection gave her a high fever and made her feel "sick to [her] stomach," so she did not return to the pain management doctor. (R. 365-66.) She had edema during that period of time but did not wear support hose because they were too expensive. (R. 368-69.) She stated that during the relevant period she had been able to sit for just ten to twenty minutes at a time and stand for five to ten minutes at a time, but could only walk about five feet without grabbing onto something. (R. 370-72.) She was up three or four times at night for pain and used a heating pad and ice to relieve pain. (R. 370, 372, 376.)

### D. <u>Vocational Expert Testimony</u>

Vocational Expert ("VE") Bob Hammond characterized Plaintiff's past relevant work as certified nursing assistant, very heavy as performed by Plaintiff. The ALJ asked the VE to consider an individual of the same age, education, and work experience as Plaintiff, with a residual functional capacity ("RFC") limiting her to work at the light exertional level, who could never climb ladders, ropes or scaffolds and who could only occasionally climb ramps or stairs and occasionally crouch, kneel, balance, crawl, stoop; who cannot have concentrated exposure to

9

heights, hazards, or extreme heat. (R. 382.) The VE testified that such a person could not perform Plaintiff's past work. (*Id.*) The ALJ asked if there exist jobs such a person could perform, and the VE replied that yes, such person could work as a parking lot assembler, as a computer chip assembler, or in a small products bench assembly position. (R. 383.) On further questioning, the VE testified that if such person needed to have the option of sitting or standing, changing positions every thirty minutes for five minutes at a time, the parking lot attendant positions would not be affected, but the bench assembly and chip assembly positions available would be reduced by about fifty percent. (*Id.*) If the individual were instead restricted to sedentary, instead of light, activity, she could work as a sealer in the pharmaceutical industry, as an eyewear assembler, or as a circuit board screener. (R. 384.) No jobs would be available if the individual were off task thirty percent of the day due to pain, if she had to take extra breaks, or if she had to miss three days of work per month. (R. 385-86.)

### E. The ALJ Decision

On January 7, 2013, the ALJ issued a decision denying Plaintiff's claim, following the required five-step sequence. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from June 17, 2005 through September 30, 2008. (R. 336.) At step two, the ALJ found that Plaintiff had the severe impairments of obesity, a history of cellulitis, lower extremity edema, herniated and bulging disks of the thoracic and lumbar spine, and thoracic kyphosis. (*Id.*) At step three, the ALJ found Plaintiff's impairments did not meet or

medically equal one of the listed impairments. (R. 337.)

__\*\*\*\*\*\*\*\*\*\*\*\*\*_____ **[[[rfc]]]**

At step four, the ALJ determined that, due to the effects of her impairments, Plaintiff was unable to perform any of her past relevant work. (R. 345.) However, at step five, based on the VE's testimony and Plaintiff's age, education, and RFC, the ALJ concluded that Plaintiff could perform jobs existing in significant numbers in the national economy, leading to a finding that she was not disabled under the Social Security Act. *(Id.* at 345-346.)

## **DISCUSSION**

**I.     ALJ LEGAL STANDARD**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the Commissioner considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of a final decision of the Commissioner (here, the decision of the Appeals Council affirming the findings of the ALJ) is limited to determining whether its findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that an ALJ's decision must be affirmed

even if "'reasonable minds could differ'" as long as "the decision is adequately supported.") (citation omitted).

The Commissioner is not required to address "every piece of evidence or testimony in the record, [but the] analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the Commissioner denies benefits to a claimant, she must "build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford v. Apfel*, 227 F.3d at 872. The written decision must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III. ANALYSIS

On appeal, Plaintiff argues that the ALJ committed multiple errors in denying her disability claim. Specifically, Plaintiff faults the ALJ for (1) performing an inadequate analysis of the November 2008 MRI evidence; (2) omitting discussion of some medical evidence and discrediting Plaintiff's own testimony in evaluating the severity of her pain; (3) improperly discounting the opinions of Plaintiff's treating physician; and (4) mischaracterizing Plaintiff's restrictions in the hypothetical questions posed to the VE.

### A. <u>Omitted Medical Evidence</u>

Plaintiff argues that the ALJ erred in omitting any mention of the treatment notes of Dr. Kloc and Dr. Schlagheck and the May 2006 opinion of chiropractor Miller. An ALJ must examine "the full range of medical evidence" pertinent to claimed impairments. *Zurawski v. Halter,* 245 F.3d at 888. While an ALJ's opinion "need not discuss every piece of evidence in the record," it must contain sufficient analysis for a reviewing court to determine whether the decision rests upon substantial evidence, and cannot omit a line of evidence that tends to show disability. *Id.* at 889; *see Golbiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003.)

This case was earlier remanded by this Court for consideration of new evidence, which at that time consisted of concurrent November 28, 2008 MRIs of Plaintiff's lumbar and thoracic spine, and a January 2009 opinion letter from Dr. Ritz stating that the results of the MRIs were consistent with Plaintiff's reports of pain. *Fieldhouse v. Astrue,* No. 09 C 6358, 2012 WL 426702 at *1; (R. 400-01, 407-

14

412, 418). In that Order, the Court encouraged the Commissioner to "use all necessary efforts to build a logical bridge between the evidence in the record and [her] ultimate conclusions." *Id.* at *14. And although the remand was pursuant to sentence six, and not sentence four, the Court acknowledged that it is sometimes necessary to allow parties on remand to expand the record in order to assure that the Commissioner's ultimate conclusion is fully supported. *Id.* at 30 (citing *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009)) (explaining further that "[t]he Commissioner should not assume that any other errors not discussed in this order have been adjudicated in [her] favor. On remand, the Commissioner therefore must carefully articulate [her] findings as to every step.").

Since that time, Plaintiff has also submitted treatment records from Dr. Kloc and Dr. Schlagheck. (R. 625-40.) The ALJ omitted any mention of these treatment records in her analysis. Additionally, the ALJ did not indicate what weight, if any, she gave to the January 2009 opinion letter of Dr. Ritz. The Commissioner argues that, because the majority of the omitted treatment records date from after Plaintiff's insured period, any error in omitting them from consideration was harmless. However, the ALJ may not simply ignore evidence post-dating Plaintiff's date last insured. The Seventh Circuit has held that an ALJ must consider all relevant evidence, including evidence regarding the Plaintiff's later condition, in determining whether a claimant was disabled before her last insured date. *Parker v. Astrue,* 597 F.3d 920, 924-925 (7th Cir. 2010.) While a remote date might provide a reason for discounting the importance of some records, "discounting is not the same

15

as ignoring." *Alesia v. Colvin,* No. 12 C 8395, 2015 WL 5062812 at *6 (N.D. Ill., Aug. 26, 2015.)

Some of the records that the ALJ ignored are relevant to at least some portion of the period covered by this claim. Dr. Schlagheck's treatment notes record a visit for back pain in December 2006, and second visit in which that pain was treated with an injection in January 2007. Both of visits occurred before her date last insured. Dr. Schlagheck's later medical records may also shed some light on Plaintiff's condition during her insured period and merit some consideration.

Dr. Kloc's notes regarding Plaintiff's December 2008 visit are relevant to her condition during insured period. Dr. Kloc wrote his notes the week after Plaintiff's MRIs and less than three months after her date last insured, and his opinion was based on his assessment of the MRI data as well as a physical exam. As this Court noted in its earlier opinion, the numerous spinal abnormalities shown on Plaintiff's MRI did not all occur between September 20, 2008 and November 28, 2008. *Fieldhouse,* 2012 WL 426702 at *9. Indeed, the ALJ's opinion acknowledges that "[t]hough the MRIs were taken after the date last insured, they would reasonably apply to at least some of the period at issue . . . ." (R. 339.) Reviewing those MRIs, Dr. Kloc adjudged Plaintiff's most severe problem to be her right radicular leg pain, which he hoped to address first, with the goal of helping Plaintiff return to work. (R. 626.) While the notes do not provide a function-by-function capacities assessment, they do indicate that Dr. Kloc saw in the MRIs and in his physical exam a degree of impairment that he viewed as severe enough to preclude work, at least for some

period of time. The question of whether a claimant can work is an issue reserved to the Commissioner, and medical opinions about such issues are never entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d at 870; 20 C.F.R. 404.1527(e). Nevertheless, the ALJ must explain what consideration she gave to Dr. Kloc's assessments. *See* SSR 96-5p. ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored.")

As to Dr. Ritz's January 16, 2009 opinion letter, the Court previously held that the letter "most reasonably interpreted, indicates that the results of the MRI exams were consistent with the chronic pain complaints Plaintiff expressed to Dr. Ritz prior to September 20, 2008." *Fieldhouse*, 2012 WL 426702, at *9. The ALJ explained that she gave "no weight" to Dr. Ritz's earlier opinions, in part because they were based solely on Plaintiff's subjective complaints. (R. 342.) The January 2009 letter, in contrast, is based on the MRI results. The ALJ should have indicated what weight that letter merited in her analysis.

The ALJ's failure to weigh Dr. Ritz's January 2009 opinion and failure to discuss the treatment notes of Dr. Schlagheck and Dr. Kloc leaves the Court unable to assess whether or how she considered all of the relevant medical evidence in assessing Plaintiff's RFC. Therefore, the case must be remanded in order for the ALJ to explain her assessment of this evidence.

### B. Assessment of Chiropractor's Opinion

The record also contains two opinion letters from chiropractor Roger Miller, dated December 29, 2005 and May 17, 2006. (R. 266, 301.) The ALJ afforded no

17

weight to the first letter because it reflected examinations that took place prior to the insured period, and because a chiropractor is "a non-acceptable medical source under the regulations." (R. 343.) She did not mention the chiropractor's May 17, 2006 opinion letter or indicate what weight, if any, it bore in her analysis. Under Social Security regulations, only an opinion from a physician, psychologist, podiatrist or other "acceptable medical source" may establish the existence of a medically-determinable impairment. 20 C.F.R. 404.1513(a). Evidence from other medical sources, including chiropractors, may be used to show the severity of a claimant's impairments and how they affect her ability to work. 20 C.F.R. 404.1513(d). *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015); *Pierce v. Colvin,* 739 F.3d 1046, 1051 (7th Cir. 2014). In deciding how to weigh the opinions of "other sources," including chiropractors, ALJs have more discretion than they do with the opinions of physicians. *Fiori v. Colvin,* No. 12 CV 50148, 2014 WL 4639468, at *11 (N.D. Ill. Sept. 16, 2014); *Mulvaney v. Barnhart,* No. 05 C 4439, 2006 WL 2252547, at *21 (N.D. Ill. Aug. 3, 2006). On remand, the ALJ should indicate what weight, if any, was given to the May 17, 2006 letter of chiropractor Miller.

### C. Other Matters

Because remand is necessary for the above reasons, the Court need not explore in detail the remaining errors claimed by Plaintiff at this time. The Court does note that, since the ALJ issued her decision in this case, the Social Security Administration has issued new guidance on how it assesses the effects of a claimant's claimed symptoms, including pain. Prior policy ruling SSR 96-7p, which

18

focused on credibility, has been superseded by SSR 16-3p in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029, at *1. As SSR 16-3p is simply a clarification the Administration's interpretation of the existing law, rather than a change to it, the same regulatory factors for evaluating the severity of Plaintiff's symptoms will apply. *See Qualls v. Colvin*, No. 14 CV 2526, 2016 WL 1392320, at *6 (N.D. Ill. Apr. 8, 2016). On remand, the ALJ should take care to assess the intensity and persistence of Plaintiff's symptoms in accordance with the guidelines of SSR 16-3p.

## CONCLUSION

For the foregoing reasons, Plaintiff Janine Fieldhouse's motion for summary judgment [Doc. No. 42] is granted. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this order.

**SO ORDERED.**　　　　　　　　　　**ENTERED:**

**DATE:    May 27, 2016**

　　　　　　　　　　　　　　　　　　**HON. MARIA VALDEZ**
　　　　　　　　　　　　　　　　　　**United States Magistrate Judge**